Filed 3/24/21  In re A.M. CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Glenn)

----

| | |
|---|---|
| In re A.M. et al., Persons Coming Under the Juvenile Court Law. | C090711 |
| GLENN COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> H.R. et al., <br><br> Defendants and Appellants. | (Super. Ct. Nos. 17JP00860, 17JP00861, 17JP00862) |

Appellants H.R. (mother) and Mi.M. (father) appeal from orders of the juvenile court terminating their parental rights and freeing minors A.M., M.M., and A.R. for adoption.  (Welf. & Inst. Code, §§ 366.26, 395.)[1]  They contend there was insufficient

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

evidence to support the juvenile court's findings that the minors are adoptable and the juvenile court erred in failing to find the beneficial parental relationship exception to adoption applies. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We limit our recitation of the facts to those necessary for resolution of the issues on appeal.

On December 21, 2017, the Glenn County Health and Human Services Agency (Agency) filed section 300 petitions on behalf of minors A.M. (age four), M.M. (age five), and A.R. (age eight), alleging the minors fell within the provisions of subdivisions (b)(1) and (g), after mother was arrested for being in possession of methamphetamine (for sale), marijuana, concentrated cannabis, hash oil, clonazepam pills, digital scales, methamphetamine smoking pipes, tasers, ammunition, and tear gas, all within reach of the minors. The minors were taken into protective custody and hair follicle tested for controlled substances. Their tests indicated high levels of methamphetamine. Mother has a lengthy criminal and child welfare history. Father[2] also has a lengthy criminal history and had been incarcerated in state prison since approximately June 2016. He was maintaining written communication with the minors during his incarceration.

At the dispositional hearing in March 2018, the juvenile court adjudged the minors dependent children and ordered them removed from parental custody. The minors were placed in foster care, with A.M. and M.M. in one foster home and A.R. in another foster home. Reunification services were ordered for both parents. Mother and father's case plans each included a mental health assessment, an outpatient drug and alcohol treatment program, substance abuse testing, parenting education, and individual counseling.

---

[2]     The whereabouts of A.R.'s biological father were unknown but the juvenile court subsequently found Mi.M. to be the presumed father of all three minors.

2

Mother was released from incarceration on or about April 4, 2018, and father was released from incarceration in or about June 2018. They were provided supervised weekly visits with the minors upon their release. Both parents resumed regular use of methamphetamine upon their release from incarceration.

Mother's reunification services were terminated in October 2018. She had been reincarcerated on or about August 31, 2018, after being sentenced to four years for welfare fraud and making criminal threats, had made only minimal progress in her services and had continued to use methamphetamine. The juvenile court continued reunification services for father, although he was only minimally complying with the terms of his parole, had also made minimal progress in his services, and was still using methamphetamine. Although all three minors had reported that they would like to be returned to parental care, mother remained incarcerated and father continued to use methamphetamine and make only minimal progress in his services. The juvenile court terminated father's reunification services in January 2019 and set a selection and implementation hearing pursuant to section 366.26.

Before the section 366.26 hearing, in anticipation of the minors being placed together in a permanent home, A.M. and M.M. were moved into the home of A.R.'s foster mother. A.R.'s foster mother, however, was not able to provide permanency for the minors. It was a difficult move for A.M. and M.M. because they had bonded with their prior foster parents and had hoped to grow up there. A.R. also was struggling with the knowledge that she would have to move from the home of her foster mother, whom she loved. The Agency located a very desirable proposed adoptive family that was committed to adopting all three minors. The minors had been visiting the proposed adoptive parents, including overnight visits, since April 2019, and had formed positive bonds with them. The proposed adoptive parents had experience adopting sibling groups, as they had previously adopted another sibling set.

All three minors stated that if they are unable to return to parental care, they would be happy in the proposed adoptive home. The minors said they love their birth parents and were sad that their parents had been unable to reunify with them, but that they understood. A.R. shared her sadness about not reunifying with them with the proposed adoptive parents, who were very supportive and able to help her work through her feelings. A.R. was anxious and excited about moving to the identified proposed adoptive home and wanted to move, but expressed that she would also miss her foster mother. A.R. also expressed several times that her biggest concerns were having a family that would always be there for her and not hit her. By May 1, 2019, the minors had repeatedly expressed their excitement about moving to the home of the proposed adoptive parents and were "actively requesting to move to their adoptive home."

Although the minors were ready to be moved to the proposed adoptive home, and had spent a large portion of their summer driving back and forth while essentially living between the two homes, the move had been delayed because father had filed an objection to the minors being moved out of the county. All three minors were reported to be suffering emotional damage from the delay in moving, with A.R. the most negatively affected, due to her age, level of awareness, and emotional attachment to her current foster mother. A.R. said she is sad to leave the proposed adoptive home to go back to the foster home and is sad to say goodbye to the foster mother. She described it as having "to say goodbye over and over again." The emotional toll on A.R. of the delay and constant transitioning had resulted in many breakdowns that involved crying, screaming, and needing to be rocked to sleep.

A.R. testified out of parents' presence at the section 366.26 hearing. She wanted the court to know that she loves her foster mother and her foster mother's daughters, her birth parents, the proposed adoptive parents and their daughter, her grandmother, and her siblings, A.M. and M.M. She explained that she is close with her foster mother and foster mother's daughters and will miss them when she moves, but she felt good about

4

living with the proposed adoptive parents. She also agreed that she would miss her parents and friends when she moved away to live in the proposed adoptive home, but she likes being there with her proposed adoptive parents.

The state adoptions specialist also testified, reiterating much of what had been previously reported. She described the minors as "wonderful," and stated she believes they are adoptable. It had not been difficult to find possible adoptive parents for them and she had many families from which to choose. She had selected a family who was open to postadoption contact, particularly because the minors had a strong relationship with their paternal grandmother, but there would be no guarantee of future contact, especially with the birth parents, and the proposed adoptive family had declined to enter into a postadoption contact agreement. She did not think the minors' bond with parents was so significant or strong that the need to maintain it outweighed the benefits of adoption.

Mother testified she visited as regularly as she was permitted, believed her visits with the minors went well and that they were sad at the end of visits. She said the minors tell her they love her and want to come home with her. Father testified he had a very close bond with the minors, he visited them regularly when not incarcerated, and he believed the minors' bond with him was more important than their need to be adopted.

The parents argued the minors were not likely to be adopted and that the beneficial parental relationship exception to adoption should apply, based on their visitation and bond with the minors. The juvenile court found the minors adoptable, that no exceptions to adoption apply, and terminated parental rights.

Additional facts are included in our discussion of the issues.

DISCUSSION

I

*Adoptability*

The parents contend the orders terminating their parental rights must be reversed because there was insufficient evidence to support the juvenile court's findings that the minors are adoptable. There was, however, ample evidence supporting the juvenile court's finding that the minors are adoptable.

"If the court determines, based on the assessment . . . and any other relevant evidence, by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (§ 366.26, subd. (c)(1).) "Although a finding of adoptability must be supported by clear and convincing evidence, it [i.e., the determination that it is likely the child will be adopted within a reasonable time] is nevertheless a low threshold . . . ." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1292.)

Determination of whether a child is likely to be adopted focuses first upon the characteristics of the child; therefore, a finding of adoptability does not require that the child already be in a prospective adoptive home or that there is a "proposed adoptive parent 'waiting in the wings.' " (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 (*Sarah M.*).) On the other hand, the fact that a prospective adoptive parent has shown interest in adopting a minor is substantial evidence the minor is likely to be adopted within a reasonable time, either by that person or some other. (*In re J.I.* (2003) 108 Cal.App.4th 903, 911, disapproved on another matter in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; *In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154 (*Lukas B.*); *Sarah M., supra*, at p. 1651.)

The Agency has the burden to establish, by clear and convincing evidence, that the minors are likely to be adopted within a reasonable time. (*In re Chantal S.* (1996) 13 Cal.4th 196, 210.) On appeal, we "must account for the clear and convincing standard of

6

proof when addressing a claim that the evidence does not support a finding made under this standard. When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before [us] is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting [our] review, [we] must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B., supra*, 9 Cal.5th at pp. 1011-1012.) The reviewing court may not reweigh the evidence when assessing the sufficiency of the evidence. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)

Applying this standard, we find substantial evidence supports the juvenile court's finding that all three minors are likely to be adopted.

With the exception of A.R. being reportedly underweight, neither of the other two minors in this case have any medical or developmental issues. All three minors had adjusted well to placement out of parental custody, had demonstrated the ability to love and form strong attachments to their caregivers, and are teeming with positive attributes.

A.M. is described as a sweet, energetic, spunky, affectionate girl who is very social. She likes and does well in school and loves to play board games. She initially participated in individual therapy to address her anxiety and any issues regarding attachment but, by September 2018 was assessed as no longer in need of mental health services, was reported not to be having any significant behavior concerns, and her mental health and emotional status appeared stable.

M.M. is described as a very energetic young man who loves outdoor activities. M.M. also likes school and performs "outstanding" in certain subject areas, and has a great overall attitude and work ethic. His teacher described him as a "wonderful young man." He, like A.M., initially participated in individual therapy to address his anxiety

and any issues regarding attachment but, by September 2018 was assessed as no longer in need of mental health services, was reported not to be having any significant behavior concerns, and his mental health and emotional status appeared stable. He had also had appropriate grief reactions to the change of placement from his initial foster family but had adjusted well to the change. He is able to express his thoughts and emotions to those he trusts.

A.R. is described as shy, thoughtful, caring, and kind-hearted. She enjoys and excels in school, is liked by her teacher, and participates in community sports. Her teacher described her as a "hard worker" and "wonderful student" who is doing "an amazing job in all areas." She had participated in weekly mental health services in 2018 to process her "feelings of abuse and neglect" and to address anger arising as a result of the separation of her family and issues regarding attachment, and had progressed in her treatment plan. In 2018, after hearing about mother's reincarceration, A.R. suffered a setback but she had continued to work with her clinician and, by the time of the selection and implementation hearing, her mental health and emotional status appeared stable. She still struggled, however, with trusting that she will not be harmed by an adult. She was continuing to receive weekly therapy, as it was determined she would benefit from ongoing therapy to process the trauma and loss she had suffered. She was "anxious and excited about moving to an adoptive home." She was sad, however, to be leaving her current foster mother, who she had grown to love. She is very articulate about her feelings when she has established a trusting relationship.

We disagree with the parents' arguments that these minors, with their plethora of positive attributes, cannot be found adoptable due to their "emotional issues, advanced age and membership in a sibling set." While the parents intimate that the minors have special needs, the evidence does not support this assertion. Both M.M. and A.M. initially had been identified as having anxiety and possible attachment issues, but both had made progress in their services and had appropriately bonded with their caregivers, and neither

8

required further mental health therapeutic services. The fact that A.R. was continuing in her counseling services does not suggest that she has special needs or is not likely to be adopted. Instead, the fact that A.R. was shown to progress in her ability to process her feelings with therapy can be viewed as a *positive* factor. And, in any event, her mental health and emotional status was stable. Moreover, even the prospect that a minor may have some continuing behavioral or emotional problems does not foreclose a finding of adoptability. (See *In re Jennilee T.* (1992) 3 Cal.App.4th 212, 224-225.) Prospective adoptive parents in general can be expected to realize that children in the dependency system are likely to suffer from emotional problems and may need continuing counseling and strong parenting. As the juvenile court impliedly found, the minors' needs were not out of the ordinary in this light.

With respect to the parents' emphasis on the minors' age, age alone cannot show that any particular minor is unadoptable, since adoptability focuses on the minor's individual characteristics. (*Sarah M., supra*, 22 Cal.App.4th at p. 1649*; In re Elise K.* (1982) 33 Cal.3d. 138, 144-145.) Indeed, the Agency was able to locate the proposed adoptive family despite the minors' alleged "advanced age." It also located the proposed adoptive family despite the minors' "membership in a sibling set," which the parents also contend render the minors unadoptable. But, even if the Agency could not find a single placement for the three minors as it admittedly preferred, the Agency could also place the minors individually, as no finding that individual placement of the minors would be detrimental to their well-being was made.

Finally, the parents complain that the minors had not yet been *placed* in the proposed adoptive home, but had been only visiting, and argue that it had not yet been shown that this particular home would meet all of the minors' needs. A finding of adoptability does not, however, require that the child already be in a preadoptive home. (§ 366.26, subd. (c)(1).) Nor does it even require a proposed adoptive home or parent " ' "waiting in the wings." ' " (*Lukas B., supra*, 79 Cal.App.4th at p. 1154*.)* What is

9

required is the likelihood of adoption within a reasonable time. (*In re Jennilee T., supra*, 3 Cal.App.4th at p. 223.) But here, there *are* such interested proposed adoptive parents, who had already formed a positive bond and relationship with the minors. Moreover, the adoptions specialist testified that it had not been difficult to find an adoptive family for the minors in this case and she had many families from which to choose. As we have said, the fact that prospective or proposed adoptive parents are interested in adopting the minors is substantial evidence the minors are likely to be adopted within a reasonable time, either by those parents or some other. (*In re J.I., supra*, 108 Cal.App.4th at p. 911, disapproved on another matter in *Conservatorship of O.B., supra*, 9 Cal.5th at p. 1010, fn. 7; *Lukas B.*, at p. 1154; *Sarah M., supra*, 22 Cal.App.4th at p. 1651.) The evidence supports the juvenile court's finding that it is highly probably the minors would be adopted within a reasonable time.

Having found substantial evidence supports the juvenile court's finding that the minors are generally adoptable, we need not address the parents' arguments regarding whether the minors also could be found specifically adoptable by their currently identified prospective adoption parents. For this reason, we also do not further address the parents' arguments questioning the evidence supporting the suitability of the proposed adoptive parents as caregivers or their home, or the parents' emphasis on the lack of time the minors have spent in the proposed adoptive home. The suitability of the proposed adoptive parent is not an issue when minors, such as these, are generally adoptable.

## II

### *Beneficial Parental Relationship Exception*

The parents also argue that the juvenile court erred by failing to find the beneficial parental relationship exception to adoption applied. We find no error.

At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must choose one of the several " 'possible alternative permanent plans for

a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citation.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.)

There are only limited circumstances which permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) Such circumstances include when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i) [beneficial parental relationship exception].)

To prove that the beneficial parental relationship exception applies, the parent must show there is a substantial, positive emotional attachment between the parent and child. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418-1419.) And even if there is such a bond, the parent must prove that the parental relationship " 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.' " (*In re S.B.* (2008) 164 Cal.App.4th 289, 297, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*); accord, *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1345 (*Jasmine D.*).) "In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H., supra*, at p. 575.) On the other hand, " '[w]hen the benefits from a stable and permanent home provided by adoption outweigh the benefits from a continued parent/child relationship, the court should order adoption.' " (*Jasmine D., supra*, at p. 1350; *Autumn H.*, at p. 575.)

11

"Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*Jasmine D., supra*, 78 Cal.App.4th at p. 1350.) The beneficial parental relationship exception to adoption is an *exception* to the general rule that the court must choose adoption where possible, and it " 'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' " (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

"The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*Autumn H., supra*, 27 Cal.App.4th at pp. 575-576.) The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.) The factual predicate of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re K.P.* (2012) 203 Cal.App.4th 614, 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)

Here, the parents generally visited regularly during those periods when they were not incarcerated, but the visits were not always positive. The parents' visits were reported to have gone "predominantly well" during the early phase of the case. Father's visits went predominately well after his release from incarceration in or about June 2018

12

until he was reincarcerated for an unspecified period of time in or about April 2019.[3]  On one occasion, however, law enforcement had to be called to one of his visits after an incident with father, which resulted in an emotional and behavioral setback for A.R. Father also missed one or more visits in November 2018 due to incarceration and failed to show for another visit for unknown reasons.  During father's period of reincarceration, he had only some telephone visitation and written communication with the minors.

Mother had authorized weekly visits with the minors for approximately five months in 2018 between her incarcerations, which also were reported to have gone predominately well.  The parents' last few visits with A.M. and M.M. before mother's reincarceration in August 2018 "went primarily well," although mother did spend a portion of one visit on her phone and the caretaker reported the minors were emotional and having a hard time with visits.  The parents would also become upset with each other during the visits, which confused the minors and made them uncomfortable.

After mother's reincarceration in August 2018, she was offered telephone visitation.  Significantly, however, mother utilized that opportunity on only two occasions.  Additionally, her telephone visits with A.M. and M.M. had been found "emotionally damaging" to the minors.  During one telephone call mother made while the minors were visiting their maternal grandmother, mother falsely told M.M she would be "getting out in two days" and they would be reunified with her in the following days.

The parents' visits with A.R. in August 2018 before mother's reincarceration did not go well.  During a late August 2018 visit with A.R., the minor acted uncomfortably, cried, and avoided interaction with her parents.  The minor was crying so hard during the visit, the visit had to be terminated early and it took the social worker considerable time

---

[3]     The record does not contain all the dates during which each parent was incarcerated throughout this case.  In addition to the periods noted herein, mother was in custody at the time of the section 366.26 hearing for a flash incarceration.

13

to console the minor. During the visit with all three minors the following day, the parents bickered, and mother appeared anxious and agitated throughout the visit. Mother was reincarcerated approximately a day or two later.

Heavily supervised, in-person visitation resumed upon mother's release on or about March 28, 2019, and those visits did not go well either. At one visit, mother told the minors they would be returning to mother's care and were not going to be adopted, which was very confusing to the minors. In May 2019, it was noted that the minors were not distressed by the end of the visit with their parents nor did they demonstrate any distress when saying goodbye and leaving the visit.

At a Child and Family Team Meeting attended by the parents on or about June 14, 2019, the paternal grandmother, and the minors, the minors ran to their grandmother first. A.M. and M.M. eventually went to greet their parents but A.R. remained with her grandmother. At the end of the meeting, mother told A.R., "I love you," to which A.R. responded, "[U]h huh."

At the July 25, 2019 visit approximately one month before the section 366.26 hearing, the parents were very upset that the visitation structure had been changed to visiting one minor at a time for 30 minutes each, in conjunction with the maternal grandmother's visit—a structure that had been designed to protect the minors after the parents' behavior suggested a possible flight risk. Parents arrived 10 minutes late to the visit and were angry with each other. They then became volatile as the structure of the visit was explained and were still being verbally aggressive toward the adoptions specialist when A.R. arrived at the visit. A.R. appeared nervous and greeted her grandmother first. Mother commenced the visit by demanding A.R. take off her sweatshirt and, when the minor refused, tried to remove the sweatshirt herself, insisting, "Take it off! What are you trying to hide?" The adoptions specialist and social worker told mother to discontinue her behavior, as she was scaring the minor. Instead, mother's behavior continued to escalate, and she said, "They are not going back to Sacramento and

14

calling someone else Mom! I'm out of here!" A.R. then responded, "I didn't even want to come here today!" Mother had to be escorted by a Special Investigations Unit officer from the visitation. The encounter visibly shook A.R., and the adoptions specialist had to cover the minor's ears, as mother was screaming obscenities as she walked out of the room. The adoptions specialist reported she could feel A.R.'s heart beating hard and fast, as she clung to the adoptions specialist.

As can be seen, even if we assume that the parents met their burden that their visitation and contact was regular, despite mother's failure to participate significantly in telephone visits during her reincarceration and father's missed visit, their contact with the minors did not demonstrate the type of substantial, *positive* emotional attachment, contemplated to support an exception to the preference for adoption. The parents' unpredictable presence in and out of the minors' lives was confusing and upsetting to the minors. Mother's false promises further confused them and threatened their sense of stability. While the minors had spent the majority of the lives in parental custody, the quality and effects of the parents' interactions with the minors became progressively negative through the life of the case, with mother demonstrating that she continued to put her needs and wants ahead of those of the minors.

Additionally, all three minors were suffering the consequences of having less than permanent placements. A.M. and M.M. were said to be "brokenhearted" to have to leave their first placement. A.R. was having emotional breakdowns from what she described as having to say goodbye to her foster parent over and over again. Indeed, the minors' biggest emotional or therapeutic issue was noted to be, not the minors' separation from their parents, but the prolonged delay to permanency. While the minors love mother and father, they also love their caregivers and desperately needed, and in the case of A.R., actually *expressed* the need for, stability. The minors had expressed some sadness about not being able to reunify with their birth parents but they had actively and repeatedly expressed their excitement and desire to move to their adoptive home. A.R. has already

15

grown to love the proposed adoptive parents. The juvenile court reasonably found that leaving the minors in a tenuous placement in order to maintain the turbulence and uncertainty of the parents' contact and behavior did not outweigh the stability and other benefits they would obtain through adoption.

Finally, we reject father's contention that "a permanent plan of legal guardianship would have provided all of the necessary and desired stability and permanence the minor [*sic*] required." "The Legislature has . . . determined that, where possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' [Citation.] 'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.' [Citation.]" (*In re Celine R., supra*, 31 Cal.4th at p. 53.) Given this preference, there must be a compelling reason to choose a permanent plan other than adoption. One was not present here.

DISPOSITION

The orders of the juvenile court (terminating parental rights) are affirmed.


                                                            KRAUSE        , J.


We concur:


     ROBIE        , Acting P. J.


     HOCH        , J.